# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

**United States of America**

v.

Jian Fun Tso,
a.k.a Steven Tso.

SEALED

Case Number: *19-7026 MB*

**(Filed Under Seal)**

### CRIMINAL COMPLAINT

I, Jeremy Kiser, the complainant in this case, being duly sworn, state that the following is true to the best of my knowledge and belief.

### COUNT ONE

Beginning on or about January 18, 2018, and continuing until on or about January 15, 2019, in the District of Arizona and elsewhere, Jian Fun Tso, a.k.a. Steven Tso, and others unknown, knowingly and willfully agreed, combined, and conspired with each other, to export or cause to be exported from the United States to the People's Republic of China, Cobham radiation-hardened programmable memory microchips, bearing part number 5962R9689109VXC, without having first obtained the required license from the United States Department of Commerce for authorization to export those items.

In violation of Title 50, United States Code, Section 1705(a) and (c); Title 15, Code of Federal Regulation, Sections 742.4, 764.2, 774, Supp. No. 1; Export Control Reform Act of 2018, Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018).

/ / /

/ / /

/ / /

1

I further state that I am a Special Agent from U.S. Immigration and Customs Enforcement, Homeland Security Investigations (HSI) and that this complaint is based on the following facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein.**

Continued on the attached sheet and made a part hereof:          ☒ Yes          ☐ No

AUTHORIZED BY: David A. Pimsner, AUSA

SA, Jeremy Kiser
_____
Name of Complainant

Signature of Complainant

Sworn to before me and subscribed in my presence

_____1/16/19_____          at          Phoenix, Arizona
Date                                                    City and State

HONORABLE BRIDGET S. BADE
United States Magistrate Judge
_____
Name & Title of Judicial Officer

Signature of Judicial Officer

2

## STATEMENT OF PROBABLE CAUSE

I, Jeremy Kiser, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed for approximately 12 years.  Prior to my employment with HSI, I served as a U.S. Customs and Border Protection Officer for three years.  As a requirement for my employment as an HSI Special Agent, I successfully completed a 12-week Criminal Investigator Training Program ("CITP") located at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. At the conclusion of CITP, I completed an additional 12-week Immigration and Customs Enforcement Special Agent Training Academy.  As part of my training at FLETC, I received extensive instruction in the areas of Immigration law, Customs law, firearms training, rules of evidence, and interview techniques.

2.      As a Special Agent with HSI, my duties include, among other things, the investigation of criminal violations of import/export law.  These laws include violations of the Arms Export Control Act ("AECA"), as proscribed by 22 U.S.C. § 2778, and the International Trafficking in Arms Regulations ("ITAR"), as proscribed by 22 C.F.R § 120, et seq. as well as violations of Title 50, United States Code, §§ 1701-1705 (International Emergency Economic Powers Act ("IEEPA")), the Export Control Reform Act ("ECRA"), and Title 18, United States Code, § 554 (Smuggling Goods from the United States).  Moreover, as a HSI Special Agent, your affiant is generally authorized to

1

investigate violations of the laws of the United States and to arrest individuals who are in violation of those laws.

3.     This affidavit is intended to show merely that there is sufficient probable cause for the issuance of a criminal complaint and does not set forth all my knowledge about this matter.   Your Affiant personally participated in this investigation and has witnessed many of the facts and circumstances described herein.   Your Affiant also received information from other federal law enforcement officials relating to this investigation.   Your Affiant has reviewed documents, recordings and interview reports during the course of this investigation. The statements contained in this affidavit are based on my own observations, review of documents and recordings, and reliable information provided to me by other law enforcement officials.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 50, United States Code, §§ 1701-1705 (International Emergency Economic Powers Act ("IEEPA")), the Export Control Reform Act ("ECRA"), has been committed by Jian Fun Tso, aka Steven TSO, and unknown persons.

## EXPORT LAWS AND REGULATIONS

### International Emergency Economic Powers Act

5.     Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Under IEEPA, the President may declare a national emergency through executive orders that have the full force and effect of law.

6.     On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to U.S. goods and technologies, and extended the Export Administration Act and its implementing regulations (the Export Administration Regulations, or "EAR," 15 C.F.R. §§ 730-774).  The President has issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the present.  *See, e.g.,* 83 Fed. Reg. Vol. 83, No. 152 (Aug. 7, 2018).[1]

7.     Pursuant to its authority derived from IEEPA, the Department of Commerce ("DOC") reviewed and controlled the export of certain goods and technologies from the

---

[1] On or about August 13, 2018, President Trump signed the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 (hereinafter, "ECRA"), Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018).  In part, ECRA provides permanent statutory authority for the EAR.  For conduct occurring before August 13, 2018, IEEPA is the applicable statute.  For conduct subsequent to August 13, 2018, ECRA applies.

United States to foreign countries through the EAR. In particular, the EAR restricted the export of goods and technology that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR imposed licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another. The most sensitive items subject to EAR controls were identified on the Commerce Control List, or "CCL," published at 15 C.F.R. § 774, Supp. No. 1. Items on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which has export controls requirements depending on destination, end use, and end-user.

8.     Pursuant to IEEPA, 50 U.S.C. § 1705(a), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and pursuant to 50 U.S.C. § 1705(c), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime.

## THE RELEVANT FACTS

9.     Homeland Security Investigations (HSI) is currently investigating Jian Fun TSO, aka Steven TSO (hereinafter, "TSO"), an individual residing in the United Kingdom, who is attempting to purchase export-controlled, radiation-hardened microchips from an undercover agent in Arizona. Based on the investigation, your Affiant believes that TSO's

is attempting to procure the export-controlled microchips for end-use in China without obtaining an export license required by U.S. law.  As a result, the investigation concerns a possible violation of Title 50, United States Code, Section 1705(a), (c), (Conspiracy to Commit a Violation of IEEPA; Conspiracy to Commit a Violation of ECRA).

10.    On January 18, 2018, TSO contacted a radiation-hardened chip manufacturer in the United States (hereinafter, referred to as "Company 1"), regarding TSO's interest in purchasing a radiation-hardened memory chip, bearing Company 1's part number 5962R9689109VXC.

11.    TSO utilized the email account, Tsosan@hotmail.com.uk (hereafter, "TSO's Email Account"), to contact Company 1.  Below is the email (partially redacted) sent by TSO to Company 1 on January 18, 2018:

*From: steven tso [mailto:tsosan@hotmail.co.uk]*
*Sent: Thursday, January 18, 2018 9:14 PM*
*To: [Company 1]*
*Subject: Auto reverse module chip*
*Good morning*

*My name Steven Tso contact no [redacted] I am looking to buy this chip or module for auto parking. Can you supply it or could you kindly direct me to the right contact thank you for your time.*

TSO attached to his email a photograph of a computer chip with the following markings:

Q
R9689109VXC
ARXX   WE30E

USA  1415
^  2UEAA
                              066

12.    A Company 1 representative spoke to TSO via telephone.  During this call,

TSO advised the representative that TSO's good friend had recently died of a heart attack,

and his friend's customers had asked TSO to source this part.  TSO claimed that the

customers wanted to use it for an automotive application and the potential was "huge."

The Company 1 representative advised TSO that, while his managers would love the

"huge" numbers, there was no way an automotive company would pay their prices.

13.    The Company 1 representative explained to TSO that Company 1 needed to

know where the customer or customers were located.  TSO responded by advising

Company 1 that the customer or customers were located in China.  The Company 1

representative advised TSO that the microchip was an American product that could not be

exported to China.  TSO then responded, "Well, I am in England."  The Company 1

representative told TSO that TSO's location was immaterial, as it was the final destination

to which the microchip would be delivered, and used, that was of concern.  The Company

1 representative told TSO that the microchip TSO was looking to procure for his customers

was controlled by United States export regulations. TSO indicated to the Company 1

representative that he knew nothing about United States' export regulation of the

microchip.

14.    Company 1 subsequently reported the suspicious contact from TSO to the Defense Security Service.[2]

15.    Your Affiant knows that the specific microchip (5962R96689109VXC) that TSO requested from Company 1 is a programmable, read-only, radiation-hardened 32K memory device.  The microchip is designed to survive in harsh environments, including extreme temperatures, excessive vibrations, and radiation exposure and, as a result, it is utilized specifically for space applications. Company 1 only produces approximately 1,000 of these microchips per year and, as a result, Company 1 does not stock the microchips, rather the microchips are made to order.  According to the Company 1 representative, all of the microchips sold in 2018 were for space applications only.  Also, according to the Company 1 representative, the part requested by TSO has an ECCN of 9A515.e.2 and, under United States' export laws and regulations, it is not exportable to China.  The Company 1 representative stated that the company had received eight requests to purchase the microchips from Chinese entities in 2018, and that Company 1 believes that the microchip is highly desired in China.  The Company 1 representative further advised that the microchip does not require a license to export to the United Kingdom, unless the end use for the microchip is for missile technology/applications.

16.    After contacting Company 1 in January 2018, in March 2018, TSO emailed a second company in the United States (hereinafter, referred to as "Company 2") regarding

---

[2] Company 1 has provided useful and reliable information to Law Enforcement in the past.

his desire to purchase the radiation-hardened microchips manufactured by Company 1. Your Affiant knows that Company 2 distributes various electronic components, including radiation-hardened microchips, internationally. TSO advised Company 2 that he was seeking radiation-hardened microchips, part number 5962R9689109VXC. This time, however, TSO advised Company 2 that he was seeking to export the microchips to the United Kingdom for use in an automobile application.

17. On March 15, 2018, TSO received a blank end-user statement on Company 2's letterhead. On the same date, TSO emailed an end-user statement to Company 2 covering the purchase of the 5962R9689109VXC radiation-hardened chips. The end-user statement identified the end-user as John Anderson of Metech ICT, and listed an email address of j.anderson2013@homail.com. The listed end use on the form was "Repair of circuit boards for cars main onboard computers."

18. Pursuant to legal process, your Affiant learned that the email account j.anderson2013@hotmail.com was created in the UK on March 15, 2018.

19. A representative of Company 2 believed that TSO's request was suspicious and referred TSO to an Undercover Agent (hereinafter, the "UCA"), who was working in Arizona for the Defense Criminal Investigative Service ("DCIS").

20. TSO first contacted the UCA via email on or about April 5, 2018. On April 27, 2018, TSO emailed the UCA and asked for his/her phone number, so that they could make contact via telephone. Between April 5, 2018, and January 9, 2019, TSO and the UCA communicated in a series of email and telephone calls.

21.     On May 8, 2018, TSO sent an email to the UCA with a purchase order attached for part number 5962R9689109VXC. The ship-to address listed on the purchase order was:  Steven Tso, TSO Support Services, 120 South Road, Waterloo Merseyside, L220ND U.K.

22.     On May 9, 2018, TSO sent the UCA an email with an attached end-user statement.  The end-user statement identified the intended end-user of the microchip as "Metech ICT" and "John Anderson Electrical Engineer."  The end-user statement also included an address for the intended end-user:  "John Anderson, 44 Handfield Road, Crosby, Liverpool, L220NX UK."

23.     Checks in the United Kingdom business registry revealed that TSO had previously owned and operated a restaurant in Liverpool with an address of 44 Handfield Road, Liverpool, L220NX UK, which is the same address as the end-user address provided by TSO. Your Affiant knows, from training and experience, that individuals involved in the illegal import and export of goods often provide false information regarding the end-user or ultimate destination, when the true end-user/ultimate destination is prohibited from receiving the item by U.S. law.

24.     On December 28, 2018, your Affiant conducted checks in the online UK company registration database (companieshouse.gov.uk) for Metech ICT. Records indicated that on October 12, 2018, a company identified as METECH ICT LTD was registered in the UK at 2 Cedar Grove Cedar Grove, Maghull, Liverpool, United Kingdom, L31 5LT. The sole company officer was listed as Simon John Rogers at that address. Neither the address nor the company officer match with the information provided by TSO

9

for Metech ICT. According to the online database, there were no other companies registered in the UK using the name "Metech ICT."

25.     On May 10, 2018, the UCA emailed TSO and advised him that the original part he requested, part number 5962R9689109VXC, had been replaced by part number UT28F256QLE. The UCA attached to the email a screenshot from Company 1's website, showing that there was a change in the part number for the requested microchip. Additionally, the UCA emailed a data sheet for the part number UT28F256QLE.

26.     On May 12, 2018, TSO sent the UCA an email containing information regarding the intended end use of UT28F256QLE. In summary, the document outlined the use of UT28F256QLE as a memory module for a reversing radar located on an automobile and listed China as a potential customer. The document contained engineering schematics detailing its use. The document was created in Microsoft Word. The properties for the document indicate that it was last modified on May 12, 2018, the same date it was sent to the UCA from TSO. Your Affiant subsequently sent the document to a Company 1 representative, and inquired about the reasonableness of the intended end use.

27.     On May 24, 2018, a Company 1 representative sent your Affiant an email containing photographs of UT28F256QLE. The representative advised that he had sent the document provided by TSO to Company 1's Digital Design & Verification Director to review the end use document for its validity.

28.     The email contained the response from the Digital Design & Verification Director on the alleged end-use paper. Those comments, partially redacted, included the following:

Absolutely no rational reason to use [Company 1] QML V Radiation hardened product in this "automotive" system study – primary disconnect is the memories are too small (but they did indicate need for multiples) vs. available commercial memory that are an order or two in magnitude larger than these and as a monolithic solution.

29.     The alleged end-use paper also contained a reference identifying China as a potential market for UT28F256QLE.

30.     Based on the training, experience, and information gathered during the course of the investigation, your Affiant knows that a commercial version of the microchip requested by TSO exists. The commercial version of the microchip has the same technical memory-storage capabilities as the microchip requested by TSO, but it is not able to withstand radiation exposure and other harsh environments. The commercial-grade microchip is available to purchase for approximately $60.00 per chip, whereas the microchip requested by TSO, which is a space-application-grade version, has a cost of approximately $2,500.00 per chip. Per the Company 1 representative, a commercial-grade version of the microchip would be sufficient for the automotive application described by TSO. Furthermore, your Affiant believes, based on training and experience, that companies would not unnecessarily use a chip with technical capabilities over and above what is necessary and at an unnecessarily increased price.

31.     On May 17, 2018, TSO and the UCA engaged in a telephone conversation during which TSO stated that he wanted to purchase two blank non-operational chips. During the phone call, TSO advised the UCA that he wanted to purchase the non-operational chips because his buyer wanted to confirm that the microchips would fit the buyer's application prior to purchasing a larger order of the functional microchips.

32.     On May 21, 2018, the UCA emailed TSO and included language from the UCA's "compliance department," which explained that the parts TSO wanted to purchase did not require an export license to the United Kingdom but did have "several restrictions" for other countries, including China.   The UCA attached to the email the Commerce Control List and the U.S. Commerce Department Country List, which detail the export controls to China on microchips sought by TSO.  Later that day, the UCA participated in a recorded phone call with TSO.   During this call, TSO discussed with the UCA the possibility of sending the same type of microchips to China in the future. The UCA told TSO that there are export restrictions to China for the part TSO is ordering. During the conversation, TSO reassured the UCA that the microchips he was currently ordering were for "John Anderson" in England.

33.     On June 1, 2018, the UCA sent an email to TSO containing a quote for two blank UT28F256QLE chips.   The quote detailed that the two blank chips would be purchased by the UCA from Company 1.  Also listed on the quote were the UCA's Arizona address and phone number.   That same day, TSO agreed to pay $1,500.00 dollars for the two non-operational versions of microchips part number UT28F256QLE.

34.     On June 5, 2018, TSO wired $1,500.00 dollars to a bank account in Arizona, controlled by the UCA, for the purchase of the two blank non-operational microchips. HSI confirmed that the wire transfer originated from Lloyds Bank, located in Great Britain. On June 21, 2018, the UCA mailed the two non-operational chips to TSO. The UCA mailed the chips to Steven TSO at 120 South Road, Waterloo, Liverpool, Merryside, L220ND, UK.

35.     On June 25, 2018, the UCA made a telephone call to TSO.  During this call, TSO advised the UCA that TSO was considering whether to expand the purported automotive application of the microchips to China.  The UCA advised TSO that the part he was ordering could likely not be exported to China because there was a presumption of denial for any requests for licenses to export the microchips to China.

36.     On June 26, 2018, the United States Department of Commerce issued a license history, certifying that neither Jian Fun TSO, aka Steven Tso, Tso Support Services, John Anderson nor Metech ICT have ever applied for, or received, a license from the Department of Commerce, which is required to legally export the above-mentioned U.S. origin goods.

37.     On or about July 5, 2018, the UCA sent TSO a proposed contract for the purchase of 400 microchips (UT28F256QLE) at the price of $2,550.00 per chip.

38.     On July 11, 2018, TSO and the UCA exchanged emails, and spoke via telephone.  During these communications, TSO and the UCA negotiated the proposed payment terms of 50% to start production, 20% when the UC could provide proof that production started, and 30% on completion and TSO's inspection.  On July 17, 2018, TSO sent an email to the UCA, stating that he had spoken to "John" and they were ready to order 200 chips.  In a separate email on July 17, 2018, TSO agreed to the proposed payment plan.  However, the payment plan later changed to a 50% down payment, and 50% final payment on completion of the chips. TSO explained that this was the decision of John Anderson and he would not deviate from these payment terms.

39.     On or about July 13, 2018, the U.S. Department of Commerce issued a license determination stating that radiation-hardened microchip, part number UT28F256QLE, is controlled under ECCN of 9A515.e.1, and a Bureau of Industry (BIS) license is generally required to export this item to China.   Notwithstanding this licensing requirement, the 2013 National Defense Authorization Act mandates a policy of denial for export licenses of 9A515 items to the People's Republic of China.  15 C.F.R. § 742.4 (b)(1)(iii), the denial policy, states in pertinent part, "When destined to the People's Republic of China . . . items classified under any 9x515 ECCN will be subject to a policy of denial."

40.     On July 17, 2018, the UCA called TSO and confirmed TSO received the contract.  During this call, TSO requested the UCA send him a second contract, with an inflated price of $2,750.00 per chips, so he (TSO) could provide this second contract to "John," the alleged end-user.  Also, on July 17, 2018, the UCA sent an email to TSO, at Tsosan@hotmail.com.uk, with the second requested contract listing the price as $2,750.00 per microchip.

41.     On July 19, 2018, the UCA and TSO spoke on the phone and TSO expressed concern whether the U.S. Government would allow the export of the chips out of the United States.  The UCA explained that the chip could go to the UK, but not to China. TSO again advised the UCA that the chips would be staying in the UK.

42.     During a July 25, 2018 phone call, TSO asked the UCA if he would get in trouble over the space-grade chips.  TSO asked the UCA if "they" will check on TSO or

John regarding the export. The UCA advised TSO that they (U.S. Government) would contact the UCA, because the UCA was the one who purchased the chips.

43.    During the investigation, TSO and the UCA corresponded and conversed about the difference in the part numbers. On July 25, 2018, the UCA advised TSO about the difference in testing and pricing between the two chips. The UCA provided quotes and contracts for both part numbers before, eventually, TSO settled on part number 5962R9689109VXC.

44.    On July 26, 2018, the UCA sent TSO two versions of the same contract for the purchase of 200 chips bearing part number 5962R9689109VXC. One version of the contract included a price of $2,650.00 per chip and the other version included a price of $2,750.00 per chip. The higher price contact was intended by TSO to show his purported end-user John Anderson. This would enable TSO to make $100.00 per microchip from the ultimate end-user.

45.    On July 26, 2018, TSO and the UCA conducted a phone call during which TSO explained to the UCA that he (TSO) would not have to pay shipping because he was going to pick up the chips and take them back to the UK. TSO also told the UCA that his Solicitor told him he could go to jail if he puts misleading information on the BIS 711 form[3] that the UCA sent to TSO via email.

---

[3] A BIS 711 is a Statement of Ultimate Consignee and Purchaser form. The form is used to ensure that the shipper/exporter obtains the necessary information about the Purchaser, Ultimate Consignee, and end use of the desired product. The information is used by the shipper/exporter to determine if a Department of Commerce Export License is required based on the end-user, end-use, or final destination. The information is also used by the shipper/exporter in determining if the Purchaser or Ultimate Consignee is prohibited from

46.     On August 7, 2018, TSO returned the signed contract to the UCA for the purchase of 200 5962R9689109VXC microchips.

47.     During an August 9, 2018 telephone call with the UCA, TSO stated he was waiting for the funds to be transferred to him. TSO explained there was a problem because John wanted to transfer U.S. dollars to TSO, but TSO's bank account was in Sterling. The conversion from U.S. dollars to Sterling and back to U.S. dollars when he paid the UCA would cost him a lot of money. TSO told the UCA that he was setting up an international bank account to aid in the transfer of the payment. TSO also told the UCA that John offered to pay TSO in cash, but TSO declined.

48.     In a series of phone calls between August 17 and August 22, 2018, TSO explained the money went from his accounts in Hong Kong to the UK. From there, the money was transferred to the UCA in the United States. TSO indicated that John Anderson, the purported end-user, would reimburse him at a later time,

49.     Your Affiant confirmed that, on August 20, 2018, the UCA's Arizona bank account received an international wire transfer in the amount of $99,970.00. On August 22, 2018, UCA's bank account received two additional international wire transfers of $104,970.00 and $59,970.00. The total for the three wire transfers was $264,910.00. Each wire transfer came from Lloyds Banking Group in the UK.

---

receiving the exports from the United States. If the shipper/exporter determines a license is required, this form is used as part of a Commerce export license application. The form also serves to place the Purchaser and Ultimate Consignee on notice that providing false information is contrary to U.S. export law and may result in imprisonment.

50.     Prior to each transfer, TSO emailed the UCA screen shots from his phone indicating he had initiated a wire transfer request. The wire transfer requests were in the amounts of $100,000, $60,000 and $105,000; however, your Affiant determined that banking fees of $30.00 dollars were deducted from each transfer.

51.     On or about October 11, 2018, the U.S. Department of Commerce issued a license determination stating that radiation-hardened part number 5962R9689109VXC is controlled under ECCN of 9A515.e.1, and a Bureau of Industry (BIS) license is generally required to export this item to China.   Notwithstanding this licensing requirement, the 2013 National Defense Authorization Act mandates a policy of denial for export licenses of 9A515 items to the People's Republic of China.  As stated above, 15 C.F.R. § 742.4 (b)(1)(iii), the denial policy, states in pertinent part, "When destined to the People's Republic of China . . . items classified under any 9x515 ECCN will be subject to a policy of denial."

52.     On August 16, 2018, United States Magistrate Judge Eileen S. Willett authorized a search warrant for TSO's Email Account. (No. 18-9310MB). On or about September 25, 2018, Microsoft, Inc., the administrator of TSO's Email Account, provided the requested records.

53.     Your Affiant reviewed the contents of TSO's Email Account. During this investigation, the UCA emailed directly the reported end-user, "John Anderson," at j.anderson@hotmail.com, but never received a reply email from the j.anderson account. Additionally, after reviewing TSO's Email Account records, TSO never emailed the j.anderson@hotmail.com account.  Based on the March 15, 2018 creation date of the

17

j.anderson@hotmail.com account, your Affiant believes that TSO created j.anderson@hotmail.com so that he would have a valid email account to include on an end-user statement provided to Company 2 and later the UCA.

54.    TSO communicated with other email accounts regarding the purchase of the radiation-hardened microchips.  One such account, identified herein as Subject Account 1 received approximately 13 to 14 emails sent from TSO's email account that referenced the purchase of the radiation-hardened microchips.  Each of the emails that TSO sent to Subject Account 1 consisted of TSO forwarding prior email communications (and in some cases, attachments) between the UCA and TSO.

55.    As one example, on May 16, 2018, TSO forwarded an email to Subject Account 1 that the UCA had sent TSO earlier that day.  In addition to the forwarded email (partially redacted) from to the UCA, TSO wrote the following:

*From: [TSO's Email Account]*
*Subject Re:*
*To: [Subject Account 1]*

*Hi Jennifer,*

*I can confirm from the last email that I sent you from [UCA's first name] confirming as follows*

*All new from manufacturer aeroflex*

*Per unit (each chip) is 2750 usd*

*Each purchase order to manufacture with take 12-14 weeks to produce*

*Minimum per order is 50-99 at 3000 usd*

*100 or more is 2750 usd*

*50% deposit per order and then the in full on completion*

*All the above details are confirmed directly from the manufacturer aeroflex and the distributor [UCA's Company Name] in America Phoenix [UCA's full name and title] sales contract no is [UCA's phone number]*

*Also confirmed from [UCA's first name] 600+ chips have gone and the last 2 that was reserved for us also gone spend two full days trying to lactate [sic] it but no success if it was located it would been dispatched ASAP many apologies from [UCA's Company Name].*

56.     Your Affiant also reviewed the inbox for TSO's Email Account and found no emails from Subject Account 1 to TSO.

57.     Pursuant to a Grand Jury subpoena, your Affiant reviewed subscriber and login information for Subject Account 1.  The records indicated that the email account was created on February 12, 2016, at an IP address registered in Hong Kong. The phone number provided when the account was created was listed as +85298014926, a Hong Kong phone number. Google Inc. also provided login IP addresses utilized between March 3, 2018, and August 31, 2018. All the IP addresses provided by Google for this time period were registered in Hong Kong.

58.     On November 14, 2018, the UCA conducted an undercover meeting with TSO at the Intercontinental Hotel in Bangkok, Thailand.

59.     During this meeting, TSO explained that he fronted the money for the 50% deposit with his own cash from China. TSO claimed that he wired the money from China to his UK bank account, and then Anderson repaid TSO by wiring money back to TSO's bank account in China.

60.     Additionally, TSO requested that the UCA create another invoice for the microchips that would reflect a lower value and a different part number of the microchips. TSO explained that the false invoice would assist him if he was stopped by Customs in the UK.  TSO told the UCA that he intended to carry the chips in his luggage and would not declare the chips in the UK in order to avoid the duties. TSO also told the UCA that he would request final payment from John Anderson once the UCA provided him with copies of the certificate of conformance and a completion date for the chips. TSO advised that he would pay for the chips prior to his arrival in the United States.

61.     The UCA further advised TSO that the chips were controlled and prohibited for export by U.S. Department of Commerce to China. The UCA told TSO that the chips were controlled due to the fact they were radiation hardened and that the typical use for the chips was space-based applications. TSO acknowledged that he understood that the chips were controlled for export from the United States. However, TSO maintained that the chips he was ordering were intended for the UK.

62.     On December 27, 2018, your Affiant received records from Google Inc. pursuant to a search warrant executed on email account Subject Account 1. Your Affiant reviewed the content of the email account. Your Affiant notes that TSO never forwarded the final $2,750 invoice to the John Anderson email account and only forwarded it to jenniferfu68@gmail.com.

63.     On December 20, 2018, the UCA sent an email to TSO, which reads as follows (partially redacted):

*From [UCA]*
*Date: 20 December 2018 at 6:32:56 pm GMT*
*To: steven tso <tsosan@hotmail.co.uk>*
*Subject: CoC*
*Steven,*

   *"Please see attached CoC as well as the previous invoice which reflects that 50% was paid for and the remaining $275,000 is due for the delivery and release of the chips. Please let me know when the funds will be transferred and I will have our accounting department monitor the account."*

*Remittance should be made to:*

*[Information for the UC Company bank account]*

*[UCA signature line]*

    64.    Attached to the email was a Certificate of Conformance ("COC") on Company 1's letterhead for 200 radiation-hardened chips 5962R689109VXC and an invoice issued on the UCA company's letterhead for the purchase of 200 radiation-hardened chips 5962R689109VXC. The attached invoice, reflecting $2,750 per chip, was the same invoice TSO requested the UCA make for the purported end-user, John Anderson.

    65.    TSO forwarded the above email to jenniferfu68@gmail.com on the same date.

    66.    The user of jenniferfu68@gmail.com then forwarded the email detailed above to email account 49243751@qq.com. The email contained no written text from jenniferfu68@gmail.com, but did include the aforementioned attachments including the higher priced invoice.

    67.    In a separate email on December 20, 2018, the user of jenniferfu68@gmail.com forwarded another email sent by TSO to 49243751@qq.com.

The original email was an email from the UCA to TSO.  The email, detailed below, is partially redacted.

> *From: jenniferfu68@gmail.com*
> *Subject: Fwd: Confirm*
> *To: <u>49243751@qq.com</u>*
> *Dear Michael,*
>
> *Here are the mails from Steven.*
>
> *---------- Forwarded message ---------*
> *From: steven tso <tsosan@hotmail.co.uk>*
> *Date: Thu, Nov 22, 2018, 09:33*
> *Subject: Fwd: Confirm*
> *To: jenniferfu68@gmail.com <jenniferfu68@gmail.com>*
>
> *Sent from my iPhone*
>
> *Begin forwarded message:*
>
> *From: [UCA]*
> *Date: 22 November 2018 at 9:25:55 am GMT+8*
> *To: steven tso <tsosan@hotmail.co.uk>*
> *Subject: Re: Confirm*
>
> *Steven! Thank you for the dinner and introducing me to your wife.*
>
> *I confirm the discussion of 50/50 payment. We can discuss the details when I find out the quantity you order next. If we can get the future orders two months apart it would be a great opportunity for both of us.*
>
> *I am still working on confirming a date with [Company 1]. I will provide you with all the paperwork prior to your final payment.*
>
>
> *Thank you.*
>
> *Sent from my iPhone*

*On Nov 21, 2018, at 5:25 PM, steven tso <tsosan@hotmail.co.uk> wrote:*

*[UCA]*
*Hope you got back to Phoenix ok? Thank you for meeting me and my wife in Bangkok!*
*When you get back to work could you do me a quick email just to confirm what we have*
*discussed regards to next order*
*50/50 deposit*
*new order every two months*
*Confirm a date for the 200 of completion and all the documentation circulation etc*
*ready so I can finalised payments*
*If I have missed out anything please do not hesitate to contact me thank you*
*Kind regards*

*Sent from my iPhone*

76.     Open source research indicated that qq.com is an instant messaging/email software service developed by the Chinese company, Shenzhen Tencent Computer System Co., Ltd.

77.     The December 20, 2018 email from the UCA to TSO initiated a series of emails and phone conversations regarding the final payment for the 5962R968910VXC chips, TSO's plans to travel to the United States to receive the chips, as well as TSO's desire to obtain technical data related to the chips.

78.     On January 3, 2019, the UCA and TSO spoke via telephone regarding TSO's remaining payment of $265,000 for the integrated circuits.  TSO explained that the Lloyds Bank account he previously used to send the first payment had charged him wire transfer fees that he wanted to avoid.  Additionally, the Lloyds Bank account would not allow him to send the remaining payment in one transfer due to maximum daily transfer limits.  TSO explained that he attempted to use a different money transfer service, but it was rejected. TSO subsequently reported he changed his Lloyds Bank account from a business bank

account to a commercial account and would be able to send the remaining amount in one payment.

79.     On January 8, 2019, TSO sent an email to the UCA with a picture attached. The picture was of a Lloyds Bank wire transfer application for $274,990.88. The sender of the account was listed as Technical Support Operation Services Limited with account number 34091868. Also detailed on the application was TSO's address and phone number. The recipient of the transfer was listed as the UCA's bank account.

80.     On January 8, 2019, the UCA and TSO spoke via telephone regarding the payment TSO had wired. TSO informed the UCA that he had transferred $275,000 as opposed to the $265,000 payment that was due. TSO stated he had to transfer the $275,000 because John Anderson was next to him while he made the transfer and that TSO told Anderson that the balance was $275,000. TSO requested reimbursement of the additional $10,000 from the UCA. TSO suggested the UCA purchase TSO's flight to the United States along with his hotel room while in Phoenix, AZ using the additional funds. The UCA informed TSO that they would pay for TSO's hotel and provide TSO with his refund when they met in Arizona.

81.     On January 9, 2019, HSI personnel checked the online bank statement for the UCA bank account. The statement showed a deposit in the amount of $274,965.88 on January 8, 2019.

82.     In subsequent communications, TSO and the UCA agreed to meet on January 15, 2019 to complete the transfer of the chips.

83.     On January 14, 2019, TSO flew from the UK to Philadelphia, Pennsylvania, and then on to Phoenix, Arizona.

84.     On January 15, 2019, TSO spoke with the UCA telephonically.  TSO again requested that the UCA provide him with a falsified invoice devaluing the total price of the transaction to $10,000.00.

85.     On January 15, 2019, TSO met with the UCA.  The entire UCA meeting with TSO was video and audio recorded.

86.     At the outset of the UCA's meeting, the UCA gave TSO $10,000 in cash, which represented a refund of the overpayment TSO had made for the purchase of the chips.

87.     During the UCA's meeting with TSO, the UCA showed TSO a box containing what TSO believed to be the 200 radiation-hardened chips bearing part number 5962R689109VXC that TSO had purchased.

88.     When the UCA inquired as to the end user of radiation-hardened chips, TSO initially maintained that the chips were destined for, and would remain in, the UK.  TSO initially took the position that Metech ICT and John Anderson were the end users.

89.     Later, TSO slightly changed his story and told the UCA that TSO hoped the chips were going to stay in the UK and that the less he (TSO) knew about the ultimate end user the better.

90.     As TSO continued to discuss the transaction with the UCA, TSO explained that John Anderson was no longer involved with Metech ICT, and "Simon" was now the point of contact for Metech ICT.

91.    The UCA told TSO that he believed that the chips were destined to China because the purported end use for automobiles was not consistent with what the chips were designed for, and that these chips are not normally purchased in these quantities. The UCA also explained that these chips were unnecessarily overpriced for an application in automobiles.

92.    Later in the meeting, TSO admitted that he was aware that the chips were destined for China.  TSO told the UCA that TSO pushed his customers last week and they told him that the chips were to be hand-carried from the UK to Hong Kong on January 18, 2019.

93.    TSO later explained that the money he paid the UCA for the chips originated in Hong Kong and China. TSO explained that the money originated in China and then went to the front companies (including Metech ICT) that he (TSO) set up in the UK and other countries. From there, TSO wired the money to his Lloyd's Bank account, which then sent the money to the UCA's bank account.

94.    The UCA told TSO that the UCA was comfortable with the chips eventually going to China, so long as they (UCA and TSO) were protected. Both TSO and the UCA expressed their desires to trust and work with each other on future orders that would be destined for China.

95.    During the discussion, TSO placed a telephone call to one of his coconspirators.  TSO explained that the coconspirator lived in Hong Kong, but was currently located in the UK.  TSO used his speakerphone to make the telephone call.  A male answered the call, but after speaking briefly to TSO in Chinese, he passed the phone

to a female. The female started to converse with TSO in the Chinese language. After a short conversation between TSO and the female in Chinese, the female spoke to the UCA in English. The female told the UCA to call her Cindy. Cindy told the UCA that if TSO returned to the UK with the chips, she was going to hand-carry them to Hong Kong on January 18. She advised that, after she carried the chips to Hong Kong, she expected other individuals to transport the chips from Hong Kong to China. Cindy explained to the UCA that she believed that this method was perfectly safe.

96.    TSO and the UCA concluded the meeting and departed the location with the chips. They then drove to a Target store, where TSO purchased a large suitcase to use in taking the chips back to the UK in checked luggage.

97.    The UCA drove TSO to the airport. HSI agents observed TSO checking the large suitcase with British Airways.

98.    HSI agents conducted surveillance of TSO as he walked through the airport and to the gate for his British Airways flight to the UK.

99.    On January 15, 2019, CBP Officers encountered TSO on the jet way of the British Airways flight when he attempted to board the plane. When asked if he had more than $10,000 in currency or any commercial goods, TSO admitted to possessing approximately $11,000 in currency, and that he had commercial goods in his checked luggage. The CBP officers escorted TSO to the customs area for further examination. While conducting a border search, the officers found the $10,000 in U.S. currency provided to TSO by the UCA. They also found various denominations of foreign currency.

100.    While conducting the search, CBP officers found an invoice for 200 chips valued at $10,000.  TSO explained that that the chips were valued at $50.00 each and they were for a company called Metech.  He further described himself as a middleman and that his customer was John Anderson.  TSO stated that the chips were for an automobile backup system.

101.    CPB officers found two other invoices for the 200 microchips.  One invoice valued each chip at $2,750.00 and the other at $2,650.00.  TSO admitted that he made the $10,000 invoice and was going to use it to evade British customs.

102.    HSI agents also conducted a cursory review of TSO's cell phone.  The agents found emails between TSO and the user of Subject Account 1.  Subsequently, the CBP officers contacted your Affiant in order to conduct a follow up interview.

103.    On January 15, 2019, your Affiant conducted a post-Miranda, recorded, interview with TSO. TSO explained that he purchased the chips on behalf of Metech and its owner John Anderson. Initially, TSO told your Affiant that the chips would be used in an automobile application dealing with automatic backup systems.

104.    Your Affiant confronted TSO with the three different invoices found by the CBP officers.  TSO stated that he created the invoice with the $10,000.00 value to assist him in evading British customs duties when he returned to the UK. TSO further advised your Affiant that the invoice with a total value of $530,000.00 was the true value of the transaction and the invoice with a total value of $550,000.00 was the invoice he was going to show his customer.

105.    TSO told your Affiant that the chips were going to stay in the U.K. and he had no knowledge whether the chips would be exported from the U.K.  TSO also stated that the $10,000.00 he declared to CBP was his profit from assisting Metech and John Anderson with the transaction.

106.    Your Affiant then told TSO that the chips were designed for space applications.  However, TSO continued to maintain the chips were for Metech and an automobile application.

107.    Your Affiant then told TSO that he had discovered a suspicious activity report filed by the manufacturer, Cobham, that identified TSO as an individual who had contacted Cobham seeking these chips for delivery to China. Your Affiant also told TSO that his explanations did not make sense and asked TSO again if the chips were destined for China. TSO then admitted that the chips were intended to be exported to China. Your Affiant asked TSO if the person who sold him the chips explained that the chips could not be exported to China. TSO acknowledged that the seller did tell him the chips were not allowed to go to China.

108.    TSO explained that he was introduced to a woman named Jennifer and that Jennifer sent him a picture of a computer chip she was seeking. TSO stated that Jennifer was in Hong Kong and he had met her on one occasion in December 2018 in Hong Kong. TSO advised that he told Jennifer the chips had to remain in the UK to which Jennifer agreed.  However, TSO explained that he knew the chips were really going to China.

109.    Based on the above facts, your Affiant believes that there is probable cause that Jian Fun Tso, aka Steven TSO, committed violations of Title 50, United States Code,

§§ 1701-1705 (International Emergency Economic Powers Act (IEEPA); Conspiracy to

Commit a Violation of the Export Control Reform Act of 2018 (ECRA)).


_____
Special Agent Jeremy Kiser
U.S. Immigration and Customs Enforcement
Homeland Security Investigations


Sworn to and subscribed before me
this _____ day of January, 2019.


_____
Honorable Bridget S. Bade
United States Magistrate Judge