ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
DAVID A. PIMSNER
Assistant U.S. Attorney
Arizona State Bar No. 007480
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona  85004
Telephone: 602-514-7500
Email: david.pimsner@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>Jian Fun Tso,<br>Aka Steven Tso,<br><br>　　　　　Defendants. | CR-19-00088-01-PHX-SPL<br><br>**PLEA AGREEMENT** |

Plaintiff, United States of America, and the defendant, Jian Fun Tso, aka Steven Tso, hereby agree to dispose of this matter on the following terms and conditions:

**1.   PLEA**

The defendant will plead guilty to Count One of the indictment charging the defendant with a violation of Title 50, United States Code (U.S.C.), Section 1705(a) and (c); and Title 15, Code of Federal Regulations (C.F.R.), Sections 742.4, 764.2, and 774 Supp. No. 1; Conspiracy to Export Items Without a License in Violation of the International Emergency Economic Powers Act, a Class C felony offense.

**2.   MAXIMUM PENALTIES**

a.   A violation of 50 U.S.C. § 1705(a) and (c); and 15 C.F.R. §§ 742.4, 764.2, and 774 Supp. No. 1 is punishable by a maximum fine of $1,000,000.00, a maximum term of imprisonment of 20 years, or both, and a term of supervised release of up to 3 years. A maximum term of probation is five years

b. According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

(1) make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

(2) pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

(3) serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

(4) pay upon conviction a $100.00 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

c. The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

d. The defendant recognizes that pleading guilty may have consequences with respect to defendant's immigration status if the defendant is a recently naturalized United States citizen or is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which defendant is pleading guilty. Although there may be exceptions, the defendant understands that the defendant's guilty plea and conviction for this offense make it practically inevitable and a virtual certainty that the defendant will be removed or deported from the United States. The defendant agrees that defendant has discussed this eventuality with defendant's attorney. The defendant nevertheless affirms that defendant wants to plead guilty regardless of any immigration consequences that this plea entails, even if the consequence is the defendant's automatic removal from the United States.

3. **AGREEMENTS REGARDING SENTENCING**

   a. <u>Stipulation</u>: Base Offense Level Calculation. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the defendant's base offense level is a level 26, based on U.S.S.G. § 2M5.1(a)(1)(A), as the defendant's offense involved the evasion, or intended evasion, of national security controls.

   b. <u>Stipulation</u>. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the defendant's sentence shall not exceed the low end of the sentencing range as calculated under U.S.S.G. § 1B1.1(a). This stipulated sentencing cap will not change based on departures considered under U.S.S.G. § 1B1.1(b). Nothing in this agreement shall preclude defendant from moving for a downward departure, variance, or sentence below the cap, or the court from imposing a sentence below the cap.

   c. <u>Acceptance of Responsibility</u>. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b)

   d. <u>Assets and Financial Responsibility</u>. The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest. The defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation

Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

**4. AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

    a.    Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the United States, at the time of sentencing, shall dismiss Counts 2 through 7 of the Indictment in CR-19-00088-01-PHX-SPL.

    b.    This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

**5. COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

    a.    If the Court, after reviewing this plea agreement, concludes that any provision contained herein is inappropriate, it may reject the plea agreement and give the defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P. 11(c)(5).

    b.    If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated. In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings. The defendant understands that any statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial, or proceeding subject to the limitations of Fed. R. Evid. 410.

**6. WAIVER OF DEFENSES AND APPEAL RIGHTS**

    The defendant waives (1) any and all motions, defenses, probable cause

determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions), and any right to file a motion for modification of sentence, including under 18 U.S.C. § 3582(c). This waiver shall result in the dismissal of any appeal, collateral attack, or other motion the defendant might file challenging the conviction, order of restitution or forfeiture, or sentence in this case. This waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics Op. 15-01 (2015)).

7. **DISCLOSURE OF INFORMATION**

   a.   The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

   b.   Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

   c.   The defendant shall cooperate fully with the U.S. Probation Office. Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

      (1)   criminal convictions, history of drug abuse, and mental illness; and

      (2)   financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

8. **FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

   a.   Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding

with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule). If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

      b.     The defendant agrees to forfeit, and hereby forfeits, all interest in any asset that the defendant owns or over which the defendant exercises control, directly or indirectly, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of the offense(s), or which was used to facilitate the commission of the offense(s), including the following property:

      1. A sum of money equal to $10,000.00, which amount represents the proceeds that the defendant obtained, directly or indirectly, possessed, owned, and exercised dominion or control.

      c.     The defendant further agrees to waive all interest in any such asset in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant further understands and agrees that forfeiture of the assets is appropriate and in accordance with the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18 U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28 U.S.C. § 2461(c).

     d.    Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the defendant in addition to forfeiture. This agreement does not preclude the United States from instituting any civil or administrative forfeiture proceedings as may be appropriate now or in the future.

     e.    The defendant agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, double jeopardy or any other means) to any forfeiture imposed as a result of this guilty plea or any pending or completed administrative or civil forfeiture actions, including that the forfeiture constitutes an excessive fine or punishment. The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding. The defendant acknowledges that all property covered by this agreement is subject to forfeiture as proceeds of illegal conduct, property facilitating illegal conduct, and substitute assets for property otherwise subject to forfeiture, and that no other person or entity has a legitimate claim to these items listed.

     f.    The defendant agrees not to file a claim to any of the listed property in any civil proceeding, administrative or judicial, which may be initiated. The defendant further agrees that he/she will not contest civil, administrative or judicial forfeiture of the listed property. The defendant agrees to waive his/her right to notice of any forfeiture proceeding involving this property, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

     g.    The government reserves its right to proceed against any remaining assets not identified either in this agreement or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible were involved in the offense(s).

     h.    The defendant hereby waives, and agrees to hold the government and its agents and employees harmless from any and all claims whatsoever in connection with the

seizure, forfeiture, and disposal of the property described above. Without limitation, the defendant understands and agrees that by virtue of this plea of guilty, the defendant will waive any rights or cause of action that the defendant might otherwise have had to claim that he/she is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

9. **ELEMENTS**
**Conspiracy to Export Items Without a License in Violation of the International Emergency Economic Powers Act**

To prove the crime of Conspiracy to Export Items Without a License in Violation of the International Emergency Economic Powers Act, the Government must prove the following elements beyond a reasonable doubt:

1. Beginning on or about January 18, 2018, and continuing until on or about January 15, 2019, in the District of Arizona and elsewhere, there was an agreement between two or more persons to commit the crime of exporting items from the United States without a license in violation of the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*;

2. The defendant became a member of the conspiracy knowing that one of its objects was to commit the crime of exporting items from the United States without a license in violation of the International Emergency Economic Powers Act.

The elements of exporting items from the United States without a license in violation of the International Emergency Economic Powers Act are as follows:

1. The defendant exported, attempted to export, or caused to be exported items from the United States,

2. The items the defendant exported, attempted to export, or caused to be exported were controlled for export on the CCL and, therefore, required a license to lawfully export the items to the destination country.

3. The defendant failed to obtain a license or other authorization from the Department of Commerce prior to exporting the items, and

4. The defendant did so knowingly and willfully.

**10. <u>FACTUAL BASIS</u>**

a. The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

Beginning on or about January 18, 2018, and continuing until on or about January 15, 2019, I, Jian Fun Tso, aka Steven Tso, conspired with other individuals to purchase Cobham radiation-hardened programmable memory microchips (microchips), bearing part number 5962R9689109VXC, in the United States and export the items to China, without obtaining the required export license from the United States Department of Commerce. In January 2018, I agreed with other individuals to locate and purchase radiation-hardened microchips from the United States. My intent was to take the microchips to the United Kingdom and, from there, I would give the microchips to another who would smuggle the microchips from the United Kingdom to Hong Kong, China. Once in Hong Kong, the microchips would be transferred to other individuals who would take them into mainland China.

During my attempts to purchase the radiation-hardened microchips, I was introduced to a purported distributor, who I later learned was an undercover agent (UCA) with Defense Criminal Investigative Service (DCIS). In April 2018, I began negotiating the purchase of radiation-hardened microchips with the UCA. I provided the UCA with a false end-user for the microchips, by providing the names John Anderson and Metech ICT in the UK. I also claimed the microchips would be used for an automotive application in the UK.

On multiple occasions, during my conversations and correspondence with the UCA, I was advised that export of the microchips was prohibited to China without a license from the Department of Commerce. On June 1, 2018, I agreed to pay $1,500.00 dollars for the two non-operational versions of the microchips. On June 5, 2018, I wired $1,500.00 dollars to a bank account in Arizona controlled by the UCA for the purchase of the two blank non-operational microchips.

The U.S. Department of Commerce issued a license determination stating that radiation-hardened microchips at issue are controlled under ECCN of 9A515.e.1, and a Bureau of Industry (BIS) license is generally required to export this item to China. Notwithstanding this licensing requirement, the 2013 National Defense Authorization Act mandates a policy of denial for export licenses of 9A515 items to the People's Republic of China. The policy of denial is found in 15 C.F.R. § 742.4 (b)(1)(iii), which states, "When destined to the People's Republic of China . . . items classified under any 9x515 ECCN will be subject to a policy of denial."

On July 17, 2018, I sent an email to the UCA stating that I had spoken to "John" and that they were ready to order 200 chips. On August 7, 2018, I returned the signed contract to the UCA for the purchase of 200 radiation-hardened microchips with a payment plan of 50% down payment, and 50% final payment on completion of the microchips. On or about August 20, 2018, I sent an international wire transfer for $99,970.00 to the UCA's bank account. Also, on or about August 22, 2018, I sent two additional international wire transfers of $104,970.00 and $59,970.00 to the UCA. The total for the three wire transfers was $264,910.00. Each wire transfer came from my bank account with Lloyds Banking Group in the UK to the UCA bank account in Arizona.

On November 14, 2018, I met the UCA at the Intercontinental Hotel in Bangkok, Thailand. I requested that the UCA create another invoice for the microchips that would reflect a lower value and a different part number of the microchips. I explained that the false invoice would assist me if I was stopped by Customs in the UK. I also told the UCA that I intended to carry the microchips in my luggage and would not declare the chips in the UK in order to avoid the duties.

On or about January 8, 2019, I wired $274,965.88 to the UCA which represented $10,000 more than the agreed upon price. I requested that the UCA reimburse me the $10,000 when I picked up the microchips in person.

On January 14, 2019, I flew from the UK to Philadelphia, Pennsylvania, and then on to Phoenix, Arizona. On January 15, 2019, I met with the UCA and was provided $10,000 in U.S. currency that represented, in part, my profit from the sale of the microchips. I was also shown a box containing what I believed to be the 202 radiation-hardened microchips that I had purchased. When the UCA confronted me about the actual destination for the microchips, I admitted that I was aware that the chips were destined for China. I told the UCA the microchips were to be hand-carried from the UK to Hong Kong on January 18, 2019. I told the UCA that the money originated in China and was sent to front companies I set up in the UK. From there, I wired the money to my Lloyd's Bank account and then sent the money to the UCA's bank account. After this discussion, the UCA agreed to continue to work with me on obtaining additional quantities of microchips.

During the meeting, I called my coconspirator who lived in Hong Kong, but who was at that time in the UK. I placed the call on speakerphone and spoke to a women who I addressed as Big Sister. She introduced herself to the UCA as "Cindy" and told the UCA that if I returned to the UK with the chips, she was going to hand-

carry them to Hong Kong on January 18. "Cindy" advised that, after she carried the chips to Hong Kong, she expected other individuals to transport the chips from Hong Kong to China. "Cindy" explained to the UCA that she believed that this method was perfectly safe and they have done it in the past. Later, I told the UCA that "Cindy" was really "Jennifer."

On January 15, 2019, the UCA took me to a store where I bought luggage to use for transporting the microchips. The UCA then took me to Sky Harbor Airport and I checked the luggage which contained, what I believed were, 202 Cobham radiation-hardened microchips. As I was attempting to board my aircraft to return to the UK, I was stopped by officers with Customs and Border Protection and escorted to another location to be interviewed. My luggage containing the microchips was seized. I knew that the Cobham radiation-hardened microchips were export controlled to China and required a license to lawfully export the microchips to China. I knowingly and willfully attempted to export the microchips to China without obtaining a license or other authorization from the Department of Commerce.

b.      The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it.

I have discussed the case and my constitutional and other rights with my attorney. I understand that by entering my plea of guilty I shall waive my rights to plead not guilty,

to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in my defense, to remain silent and refuse to be a witness against myself by asserting my privilege against self-incrimination, all with the assistance of counsel, and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter my guilty plea as indicated above on the terms and conditions set forth in this agreement.

I have been advised by my attorney of the nature of the charges to which I am entering my guilty plea. I have further been advised by my attorney of the nature and range of the possible sentence and that my ultimate sentence shall be determined by the Court after consideration of the advisory Sentencing Guidelines.

My guilty plea is not the result of force, threats, assurances, or promises, other than the promises contained in this agreement. I voluntarily agree to the provisions of this agreement and I agree to be bound according to its provisions.

I understand that if I am granted probation or placed on supervised release by the Court, the terms and conditions of such probation/supervised release are subject to modification at any time. I further understand that if I violate any of the conditions of my probation/supervised release, my probation/supervised release may be revoked and upon such revocation, notwithstanding any other provision of this agreement, I may be required to serve a term of imprisonment or my sentence otherwise may be altered.

This written plea agreement, and any written addenda filed as attachments to this plea agreement, contain all the terms and conditions of the plea. Any additional agreements, if any such agreements exist, shall be recorded in a separate document and may be filed with the Court under seal; accordingly, additional agreements, if any, may not be in the public record.

I further agree that promises, including any predictions as to the Sentencing Guideline range or to any Sentencing Guideline factors that will apply, made by anyone (including my attorney) that are not contained within this written plea agreement, are null and void and have no force and effect.

I am satisfied that my defense attorney has represented me in a competent manner.

I fully understand the terms and conditions of this plea agreement. I am not now using or under the influence of any drug, medication, liquor, or other intoxicant or depressant that would impair my ability to fully understand the terms and conditions of this plea agreement.

1/22/20
Date

JIAN FUN TSO, aka STEVEN TSO
Defendant

## APPROVAL OF DEFENSE COUNSEL

I have discussed this case and the plea agreement with my client in detail and have advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible. I have further discussed the concept of the advisory Sentencing Guidelines with the defendant. No assurances, promises, or representations have been given to me or to the defendant by the United States or any of its representatives that are not contained in this written agreement. I concur in the entry of the plea as indicated above and that the terms and conditions set forth in this agreement are in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.

1/22/20
Date

032226 AZ Bar No
SETH APFEL
Attorney for Defendant

//
//
//

## APPROVAL OF THE UNITED STATES

I have reviewed this matter and the plea agreement. I agree on behalf of the United States that the terms and conditions set forth herein are appropriate and are in the best interests of justice.

Date 1/27/20

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

DAVID A. PIMSNER
Assistant U.S. Attorney

## ACCEPTANCE BY THE COURT

Date JUNE 15, 2020

HONORABLE STEVEN P. LOGAN
United States District Judge

- 15 -